UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

In re

**MICHAEL ALAN STORER** and
**TABATHA JEAN STORER**,

Debtors.

Case No. **06-60984-7**

**JOHN R BUSINGER** and **KATHERINE J BUSINGER**,

Plaintiffs.

-vs-

**MICHAEL ALAN STORER**,

Defendant.

Adv No. **07-00010**

## *MEMORANDUM of DECISION*

At Butte in said District this 14th day of November, 2007.

Plaintiffs John R. Businger ("John") and Katherine J. Businger ("Kathy"), collectively referred to as the "Busingers", commenced this Adversary Proceeding on February 14, 2007, seeking a determination that amounts the Busingers paid a third party contractor to finish their home above and beyond the contract amount agreed to by the Busingers and LynxxBuilders, LLC is nondischargeable in Debtor Michael Alan Storer's bankruptcy proceeding under 11 U.S.C. § 523(a)(2). After due notice, trial in this matter was held November 8, 2007, in Billings.

1

Attorney Dane Schofield of Billings, Montana, appeared at the trial on behalf of the Debtor/Defendant, Michael Alan Storer ("Mike") and attorney Craig D. Martinson of Billings, Montana, appeared on behalf of the Busingers. At trial, Kathy, John, Alan Frank Storer ("Doug"), Mike and Dennis Rader testified. In addition, the Busingers' Exhibits 1 through 12 were admitted into evidence without objection, Exhibit 13 was admitted into evidence over the objection of Mike, and Mike's Rebuttal Exhibit 14 was admitted into evidence over the objection of the Busingers. This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law. For the reasons set forth herein, Judgment is entered in favor of Mike, and the Busingers' Complaint is dismissed with prejudice.

### BACKGROUND

On November 6, 2007, the Court approved the Final Pretrial Order submitted jointly by the Busingers and Mike. In the Pretrial Order, the parties state their contentions and provide the following "Agreed Facts:"

    1. Plaintiffs are Creditors in the above-entitled bankruptcy case.

    2. This adversary action is being brought in connection with the Debtors' case under Chapter 7, Bankruptcy Case. No. 07-60116.

    3. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.§157, §1334 and 11 U.S.C. §523. This is core proceeding under 28 U.S.C. §157(b)(2)(I).

    4. By Contract dated August 5, 2005, the Plaintiffs entered into a Construction Contract with Lynxx Builders LLC ("Lynxx") whereby Lynxx agreed to construct for Plaintiffs a personal residence located at 590 Shane Creek Road, Columbus, Montana ("dwelling").

    5. That by the terms of the initial written construction contract Lynxx was to be paid

the sum of $165,991.20 for the construction of the Plaintiffs' dwelling subject to the terms of the Construction Contract.

    6. That in executing this Construction Contract, Lynxx held itself out, through the affirmatives and agreements of its members to have the knowledge, expertise, and abilities to construct in a timely manner and in a workmanlike manner the dwelling of the Plaintiffs.

    7. Upon execution of the Construction Contract and Construction Agreement, Lynxx commenced construction of Plaintiffs' dwelling at 520 Shane, Columbus, Montana.

    8. Before completion of the construction of the dwelling, Lynxx terminated all further construction work on the dwelling.

    9. That Lynxx and Alan Frank Storer made requests for advances, stating in the request for advances the name of subcontractor and/or supplier and the amount allegedly owed that party for services performed.

    10. That each of the following documents, which are attached hereto as Exhibits, is genuine.

> 1. Construction Contract dated 8/01/2005 by Lynxxbuilders, LLC as Builder and John and Kathy Businger as Owners.
>
> 2. Construction Agreement dated September 1, 2005, between Northwest Farm Credit Services, FLCA as lender and John and Kathy Businger as Borrower.
>
> 3. Construction Draw payment receipts dated October 11, 2005, December 12, 2005, February 16, 2006, April 20, 2006, May 12, 2006, and May 17, 2006.
>
> 4. Estimate prepared by LynxxBuilders in 4 pages.
>
> 5. Prepaid construction items dated August 1, 2005.
>
> 6. Letter dated June 12, 2007, by Alan Storer.

      7. Draw request dated October 3, 2005.

      8. Draw request dated February 6, 2006.

      9. Draw request dated April 7, 2006.

      10. Draw request dated May 8, 2006.

Prior to 2002 or 2003, Doug built homes for many years as a sole proprietor doing business as LynxxBuilders. Around 2002 or 2003, Doug and his son, Mike, formed LynxxBuilders, LLC ("Lynxx") and were its sole members.

The Busingers, who previously lived in Colorado, purchased a piece of real estate from Dennis Rader. The Busingers subsequently approached Lynxx about the possibility of building a home for the Busingers on the parcel of property they purchased from Dennis Rader. Prior to entering into the Construction Contact with Lynxx, Kathy testified that she and John looked at other homes that Lynxx had built and had talked to references provided by Doug. According to Doug, Lynxx had built approximately six homes for other people prior to the time that the Busingers contacted Lynxx.

The Busingers negotiated the terms of a Construction Contract with Doug and eventually entered into the Construction Contract dated August 1, 2005, wherein Lynxx agreed to build the Busingers a home at a price of $165,991.29. Exhibit A. Lynxx began construction of the Busingers' home on or about September 1, 2005, and according to Doug, Mike, John and Kathy, the relationship between the parties was amicable at all times between the date of the Construction Contract and June 9, 2006. Notwithstanding the lack of any sort of animosity between Doug and the Busingers, Doug characterized the Busingers' building project as the worst experience of his life.

As set forth in paragraph 12 of the Construction Contract, Doug estimated that Lynxx would complete construction of the Busingers' home within 6 months from the date construction commenced. The 6-month completion date could be extended for various delays. The Busingers obtained a construction loan from Farm Credit Services along with a commitment for a permanent loan. As set forth in the "Summary of Construction Funding Process," Farm Credit Services agreed that it would do a construction inspection for each draw request submitted by Lynxx. As part of the loan process, the Busingers and Lynxx disclosed that as of August 1, 2005, the Busingers had paid Lynxx prepaid construction items totaling $2,300.00; $800.00 for "plans and specs" and $1,500.00 for "const. supervisory fee." Exhibit 2.

As previously noted, Lynxx began construction on the Busingers' home on or about September 1, 2005. In response to draw requests submitted by Lynxx to Farm Credit Services, Lynxx was wired funds in the following amounts on the following dates: $29,429.79 on October 11, 2005; $24,440.21 on December 12, 2005; $31,452.06 on February 16, 2006; $20,393.45 on April 20, 2006; $5,659.96 on May 12, 2996; and $25,076.98 on May 17, 2006. Thus, including the prepaid construction items of $2,300.00, Lynxx was paid a total of $138,752.45 toward the construction of the Busingers' home.

The first notification of wire transfer dated October 11, 2005, exhibit 5, reflects that funds were wired to an account bearing the following name: "Alan F. Storer Business Account." Other information provided to the receiving bank is listed as: "Construction Advance - Businger (Lynxx Builders, LLC)." The subsequent wire transfer information reflects that money was wired to "Alan F. Storer Business Account." Doug explained that he and Mike had agreed to segregate the funds obtained from the Busingers' project from Lynxx' SBA account. However,

5

neither Mike nor Doug commingled personal funds with any of the funds in the "Alan F. Storer Business Account." The "Alan F. Storer Business Account" was used solely for business purposes.

Lynxx did not complete construction of the Busingers home within 6 months as anticipated and simply left the job on June 9, 2006, and did not return, leaving the Busingers with a partially built home. It appears from the testimony that the Busingers had no idea why Lynxx left the job until after this Adversary Proceeding was commenced. Doug explained at the trial that several factors contributed to Lynxx leaving the job site. Doug admitted that he mistakenly under-bid the project due in part to the fact that overall construction costs increased substantially after Lynxx and the Busingers entered into the Construction Contract. In addition, the construction of the Busingers' home took longer than the parties anticipated. Doug and the Busingers discussed during their negotiations that it was the Busingers' responsibility to provide an all-weather road to the construction site and to provide power to the construction site. Doug, however, advised the Busingers that Lynxx could begin construction without power to the site because Lynxx owned a generator. Due to inclement weather, the road to the Busingers' home was sometimes impassable. For instance, Doug testified that two crucial deliveries had to be cancelled due to the condition of the road. Other occasions occurred when cement trucks could not get to the construction site. In addition, the Busingers did not provide power to the construction site for several months. Lynxx started the construction project using its generator but was forced to rent a generator when its generator blew up. Lynxx spent $1,900.00 to rent a generator.

Further complicating matters was, according to Doug, the fact that the Busingers were

exceeding some of their allowances for various items in the home. As an example, Doug testified, as reflected in Exhibit 11, that the Busingers were $5,858.08 over their allowance for doors and windows. The Busingers knew that it was possible that they were over their allowances on certain items, but expected that Lynxx would submit change orders to the Busingers for such items. Doug testified that he never approached the Busingers with change orders because he did not like confrontation. Doug characterized himself as "a chicken."

Rather than address the financial issues with the Busingers, Doug sent a letter to Farm Credit Services dated June 12, 2006, which letter reads in part:

> I have not yet received copies of the contract with John and Kathy Businger that I requested May 30th. I also needed a draw request.
>
> The Busingers have exceeded some of their allowances to the point that we are unable to continue with this contract. For example they are over their door budget by $5858.08. Their cabinet budget will be almost 7500.00 over their allowance. These allowances were a part of the contract.
>
> Adding to this is the fact that almost every material and service has gone up in the last year, and the time that is has taken us to get this far. There were a lot of cancelled deliveries and delayed services due to the weather and the lack of a serviceable road to the jobsite until this spring. Electrical service was not available for the first 4 months.
>
> * * *
>
> I regret this decision but we have no other choice. We have decided to go out of business completely and are in the process of dissolving LynxxBuilders, LLC with the Secretary of the State of Montana.

When Lynxx left the Busingers' home on June 9, 2006, the Busingers did not know that Doug and Mike had no intention of returning to complete the Busingers' home. The Busingers made several attempts after June 9, 2006, to contact Doug and Mike, to no avail. When if finally became apparent to the Busingers that Lynxx would not be returning to the job site, the

Busingers first contacted a lawyer, then negotiated with their construction lender, Farm Credit Services, to alter the construction loan agreement, and finally, hired another contractor to complete the home. The Busingers had to pay the new contractor $99,550.00 to repair and/or complete the work started by Lynxx.

Kathy testified at the hearing that the Busingers were required to pay $80,000.00 more than they anticipated for their home due to the fact that Lynxx did not complete their home. The Court questions Kathy's calculations. The wire transfer notices in Exhibit 5 show that Farm Credit Services paid $136,452.45 to Lynxx between October 11, 2005, and May 17, 2006. Per Exhibit 2, Lynxx also received payment of $2,300.00 for prepaid construction items. Thus, Lynxx was paid a total of $138,752.45 for the work it did on the Busingers' home. The Busingers then paid another contractor $99,550.00 to finish and/or repair the work started by Lynxx. The total construction cost of the Busingers' home was thus $238,302.45, or $72,311.16 more than the Busingers originally anticipated. However, the Busingers agree that even if Lynxx had completed their home, the total price might have exceeded $165,991.29 because the Busingers were exceeding some of their allowances.

Mike had very little personal contact with the Busingers between the time that the Busingers contacted Lynxx and the date that Lynxx left the job site on June 9, 2006. However, Mike and Doug, as Lynxx, did most of the work on the Busingers' home and Mike agreed that he did sign the Construction Contract shown in Exhibit 1. Mike and Doug both testified that they never agreed to be personally liable for the construction of the Busingers' home.

## *JURISDICTION*

*and*
## STANDARD OF REVIEW

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This is a core proceeding to determine the dischargeability of a particular debt under 28 U.S.C. § 157(b)(2)(I). It is well-settled that the Bankruptcy Code's central purpose is to provide a fresh start to the honest but unfortunate debtor. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). However, under certain circumstances, a creditor may seek to except from a debtor's discharge certain debts. *See* 11 U.S.C. §§ 523(a). Nevertheless, consistent with effectuating the underlying purposes of the Bankruptcy Code, exceptions to discharge under §§ 523 are to be narrowly construed. *See Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992). Notwithstanding the weighty burden, a creditor, in order to prevail, need only establish the elements of nondischargeability under 11 U.S.C. § 523, by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. at 287-88.

## APPLICABLE LAW

To establish nondischargeability as a result of fraud under § 523(a)(2)(A)[1], courts in the Ninth Circuit employ the following five-part test:

(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor;

---

[1] 11 U.S.C. § 523(a)(2)(A) reads:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–

\* \* \*

    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–
        (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

>  (2) knowledge of the falsity or deceptiveness of his statement or conduct;
>  (3) an intent to deceive;
>  (4) justifiable reliance by the creditor on the debtor's statement or conduct; and
>  (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1246 (9th Cir. 2001*); American Express Travel Related Services Co. Inc. v. Hashemi (In re Hashemi),* 104 F.3d 1122, 1125 (9th Cir.1996); *Apte v. Japra, M.D., F.A.C.C., Inc. (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996). The determination of nondischargeability under § 523(a)(2)(A) is a question of federal, not state law and since the elements of § 523(a)(2)(A) mirror the common law elements of fraud, courts must interpret these elements consistent with the common law definition of "actual fraud" as set forth in the Restatement (Second) of Torts (1976) §§ 525-557A. *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 443-44, 133 L.Ed.2d 351 (1995) ("'false pretenses, a false representation, or actual fraud,'. . . are common-law terms, and...in the case of 'actual fraud,'...they imply elements that the common law has defined them to include.").

1. Intent to Deceive

The first three elements of § 523(a)(2)(A), when taken together, establish the element of intent to deceive, which the creditor must establish by a preponderance of the evidence. In other words, a creditor must establish that a debtor knowingly made a false representation, either express or implied, with the intent of deceiving the creditor. Since direct proof of intent to deceive is nearly impossible to obtain, the element of intent may be inferred from proof of surrounding circumstances "if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor." *Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir. 1996) (allowing courts to infer the existence of intent in the context of credit

card fraud).

As to the remaining elements, a creditor sustains its burden of proof under § 523(a)(2)(A), if a Court, after considering the facts and circumstances of a particular case, answers the following two inquiries in the affirmative: 1) did the creditor justifiably rely on the debtor's representation–reliance; and 2) was the debt sought to be discharged proximately caused by the first two elements–causation.

## 2. Reliance

A creditor must establish that it relied on the false representations made by the debtor. *Field*, 116 S.Ct at 438 (1995). Such reliance need not be reasonable, but it must be justifiable. *Id*. As the Supreme Court held in *Field*, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id*. at 444 (quoting § 540 Restatement (Second) of Torts (1976)). This standard depends upon the knowledge and experience of the person to whom the representations were made. As the Supreme Court in *Field* further explained:

> [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses."

*Id*. (quoting § 541, Comment a., Restatement (Second) of Torts (1976)). Interpreting this standard, the Ninth Circuit Court of Appeals teaches: "Although one cannot close his eyes and

blindly rely, mere negligence in failing to discover an intentional misrepresentation is no defense for fraud." *Apte*, 96 F.3d at 1322.

### 3. Causation

Finally, to prevail under 11 U.S.C. § 523(a)(2)(A), a creditor must establish that a claim sought to be discharged arose from an injury proximately resulting from his or her reliance on a representation that was made with the intent to deceive. *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991). "Proximate cause is sometimes said to depend on whether the conduct has been so significant and important a cause that the defendant should be legally responsible." *Id.* at 604. Moreover, as the United States Supreme Court explained in *Field*, a court may turn to the Restatement (Second) of Torts (1976), "the most widely accepted distillation of the common law of torts" for guidance on this issue. *Field*, 116 S.Ct. at 443.

The Restatement (Second) of Torts (1976) explains that proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a "substantial factor in determining the course of conduct that results in loss, § 546; and (2) legal causation, which requires a creditor's loss to "reasonably be expected to result from the reliance." § 548A. *See also In re Creta*, 271 B.R. 214, 220 (1st Cir. BAP 2002). In determining the presence of proximate cause, however, courts must refrain from relying on speculation to determine whether and to what extent a creditor would have suffered a loss absent fraud. *Siriani v. Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. (In re Siriani),* 967 F.2d 302, 306 (9th Cir. 1992).

## *DISCUSSION*

The initial inquiry in this Adversary Proceeding, as set forth in the "Questions of Law" portion of the Final Pretrial Order, is whether Mike is personally liable "for a breach of contract

that was entered into by Lynxx Builders, LLC, a corporate entity". The Busingers' contentions on the above issue are as follows:

> 4. That the actions of the individuals can create personally [sic] liability not withstanding [sic] the fact that the original contract created the relationship between the individuals was entered into by the individual's corporate entity.
>
> 5. That the receiving corporate disbursements into a personal checking account creates a non dischargeable liability that is a personal liability.

As a general rule, members of a limited liability company are not subject to personal liability for corporate obligations. However, in certain instances, courts in Montana have disregarded the corporate form, and the general immunity attendant thereto, by imposing personal liability on controlling shareholders. *Flemmer v. Ming*, 621 P.2d 1038, 1042, 190 Mont. 403 (Mont. 1981). In such instances, the courts have "pierced the corporate veil." In discussing the doctrine of "piercing the corporate veil, the Montana Supreme Court instructs:

> Piercing the corporate veil is an equitable remedy used to curb injustices resulting from the improper use of a corporate entity. Because the remedy is equitable, no concrete formula exists under which a court will disregard the separate identity of the corporate entity. Use of this remedy depends entirely upon the circumstances of each case. See Comment, *Piercing The Corporate Veil in Montana*, 44 Mont.L.Rev. 91, 92-93 (1983). However, this Court has previously required two general factors to be present before a court will disregard the separate and distinct identity of a corporation: (1) The corporation must be a mere agent or alter ego of the parent company; and (2) the corporate cloak must have been used to defeat public convenience, justify wrong, perpetrate fraud, or to defend crime. *State ex rel. Monarch Fire Ins. Co. v. Holmes* (1942), 113 Mont. 303, 307-08, 124 P.2d 994, 996.

*Hando v. PPG Indus., Inc.*, 771 P.2d 956, 960, 236 Mont. 493 (Mont 1989). In discussing the first prong of the above two-prong test articulated by the Montana Supreme Court, the Ninth Circuit Court of Appeals identified six factors which may show whether a corporation is a mere alter ego of its shareholders:

The factors relevant to a finding of alter ego include, but are not limited to:

1. Whether the individual is in a position of control or authority over the entity;
2. Whether the individual controls the entity's actions without need to consult others;
3. Whether the individual uses the entity to shield himself from personal liability;
4. Whether the individual uses the business entity for his or her own financial benefit;
5. Whether the individual mingles his own affairs in the affairs of the business entity;
6. Whether the individual uses the business entity to assume his own debts, or the debts of another, or whether the individual uses his own funds to pay the business entity's debts.

*See generally Hando*, 771 P.2d at 960; *Drilcon, Inc. v. Roil Energy Corp., Inc.*, 230 Mont. 166, 749 P.2d 1058, 1063-64 (1988); *Meridian Minerals Co. v. Nicor Minerals, Inc.*, 228 Mont. 274, 742 P.2d 456, 462 (1987); Jody J. Brewster, *Piercing the Corporate Veil in Montana*, 44 Mont.L.Rev. 91, 95-97 (1983); *see also Valley Finance*, 629 F.2d at 172-73.

*Towe Antique Ford Found. v. Internal Revenue Serv.*, 999 F.2d 1387, 1391 (9th Cir. 1993).

In the instant case, it is undisputed that Lynxx was a closely-held limited liability company and at all times relevant to this case, Mike and Doug owned 100% of Lynxx and were the only two individuals who had any dominion or control over Lynxx' activities. Thus, the first two elements discussed by the Court in *Towe* would weigh in favor of the Bunsingers and a finding that Lynxx is the alter ego of Mike and Doug. This Court could conclude similarly on factors 3 and 4. However, factors 5 and 6 weigh in Mike and Doug's favor. Doug testified that his and Mike's personal affairs were not mingled with Lynxx and Lynxx did not assume any of Doug or Mike's personal debts. Nevertheless, the Court is troubled by the fact that Mike has included the Busingers as a creditor having an "unknown" unsecured claim on Schedule F. In addition, Mike's Schedule F includes all the vendors referenced in Exhibit 11 as creditors having

unsecured claims in amounts that are identical to the amounts set forth on Exhibit 11.  Mike certainly would not have listed the Busingers, American Appliance, Billings Insulation Service, Treasure State Electric, D and L Construction, R Crew and Bloedorn Lumber as creditors on his Schedule F if he believed he was not personally liable for the obligations of Lynxx.  The Court thus concludes that Lynxx was Mike and Doug's alter ego.

The Court's next inquiry is whether Mike and Doug used Lynxx as a subterfuge to defeat public convenience, justify wrong, perpetrate fraud, or to defend a crime.  As noted in one case, "'public convenience' refers to something fitting or suited to the public need." *Drilcon, Inc. v. Roil Energy Corp., Inc.*, 749 P.2d 1058, 1063 (Mont. 1988).  The Busingers did not present any evidence to suggest that Lynxx was used as a subterfuge by Mike or Doug to defeat public convenience.  In addition, no evidence exists in the record that Lynxx was used to justify a wrong or to defend a crime.  Thus, the determination of Mike and Doug's personal liability hinges on whether Lynxx was used as a subterfuge to perpetrate a fraud.

In the case of *Drilcon*, the Court recognized "that something less than a positive showing of fraud is needed to pierce the corporate veil." *Id.*, 749 P.2d at 1064 (citing *E.C.A. Envtl. Mgt. Services, Inc. v. Toeynes*, 679 P.2d 213, 219 (Mont. 1983)).  Additionally, when addressing the issue of fraud in the context of corporate liability, the Court in *Drilcon* notes that it is not necessary to "distinguish between the acts of an alleged corporate agent . . . as opposed to the acts of the party sought to be held liable[.]"  After considering the testimony and exhibits presented at trial, and as will be discussed more thoroughly below, the Court concludes that Lynxx was not used by either Mike or Doug as a subterfuge to perpetrate a fraud.

Because Lynxx was not used by Mike and Doug to defeat public convenience, justify

wrong, perpetrate fraud, or to defend crime, this Court concludes that under the standard articulated by the Montana Supreme Court in *Hando*, it is not appropriate in this case to disregard the separate and distinct identity of Lynxx. Therefore, the Busingers' Complaint against Mike must fail. However, even if the Court were to pierce the corporate veil, the Court concludes that the Busingers have failed to satisfy the elements of their fraud claim under § 523(a)(2)(A).

Under § 523(a)(2)(A), the Busingers must first establish by a preponderance of the evidence that Mike induced the Busingers, either through the use of false pretenses, false representations or actual fraud, into letting Lynxx build the Busingers' home. Mike testified at the trial that his involvement with the Busingers was very limited and almost all of the negotiations surrounding the Construction Contract were between Doug and the Busingers. In sum, the Busingers failed to present any evidence that Mike or Lynxx intentionally set out to harm the Busingers by providing them with a bid, which in hindsight, was understated.

After carefully considering the record, the law and the testimony of the parties, the Court finds that the Busingers have not sustained their burden of proof. In particular, the Busingers have not established, by a preponderance of the evidence, that Mike or Lynxx intended to defraud the Busingers or that Mike and Lynxx intentionally provided a false estimate for the cost of construction. The record in this case illustrates that the Busingers might have a breach of contract action, and nothing more, and breach of contract actions do not give rise to an action in fraud. As stated in *Leeb v. Guy (In re Guy)*, 101 B.R. 961, 978 (Bankr. N.D.Ind. 1988):

> [A] mere breach of contract by the debtor without more, does not imply existence of actual fraud for purposes of the exception to discharge under § 523(a)(2)(A). *In re Emery*, 52 B.R. 68, 70 (Bankr. E.D.Pa. 1985).

### *CONCLUSIONS of LAW*

1. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 1334 and 157.

2. This is a core proceeding to determine the dischargeability of a particular debt under 28 U.S.C. § 157(b)(2)(I) and 11 U.S.C. § 523(a)(2)(A).

3. The Busingers have failed to satisfy their burden under 11 U.S.C. § 523(a)(2)(A) by showing that Mike made any type of false representation to the Busingers.

IT IS THEREFORE ORDERED a separate Judgment on the merits shall be entered in this adversary proceeding in favor of the Defendant, Michael Alan Storer, and against the Plaintiffs, John R. Businger and Katherine J. Businger; and the Plaintiffs' Complaint against the Defendant under 11 U.S.C. § 523(a)(2)(A) is DISMISSED.

BY THE COURT

/s/ Ralph B. Kirscher
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana